Filed 8/12/16  P. v. Guerrero CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D069934 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FSB 1200606) |
| EMILIO GUERRERO et al., | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of San Bernardino, Elia V. Pirozzi, Judge.  Affirmed.

Jennifer Peabody, under appointment by the Court of Appeal, for Defendant and Appellant Emilio Guerrero.

Stephen M. Lathrop, under appointment by the Court of Appeal, for Defendant and Appellant Jeremy J. Figueroa.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Scott C. Taylor and Junichi P. Semitsu, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Emilio Guerrero and Jeremy J. Figueroa (together Appellants) of two counts of first degree murder (Pen. Code,[1] § 187, subd. (a); counts 1 & 2); possession of a firearm by a felon (§ 29800, subd. (a); count 3 as to Guerrero and count 4 as to Figueroa); and street terrorism (§ 186.22, subd. (a); count 5). The jury also found true that Appellants committed counts 1 through 4 for the benefit of, at the direction of, or in association with a criminal street gang within the meaning of section 186.22, subdivision (b)(1)(C). In addition, the jury found true that, as to counts 1 and 2, Appellants personally and intentionally discharged firearms causing great bodily injury and death to the victims within the meaning of section 12022.53, subdivisions (b), (c), and (d). And the jury found true the enhancement that a principal personally and intentionally discharged a handgun causing great bodily injury and death to the victims within the meaning of section 12022.53, subdivisions (b), (c), (d), and (e)(1).

At a bifurcated proceeding, the trial court found, as to counts 1, 2, 3, and 5, Guerrero suffered a prior serious or violent felony or juvenile adjudication within the meaning of the Three Strikes law (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)), a prior serious felony within the meaning of section 667, subdivision (a)(1), and a prior prison term within the meaning of section 667.5, subdivision (b). The trial court also found, as to counts 1, 2, 4, and 5, Figueroa suffered one prior serious or violent felony or juvenile

---

[1] Statutory references are to the Penal Code unless otherwise specified.

2

adjudication[2] within the meaning of the Three Strikes law, suffered a prior serious felony conviction within the meaning of section 667, subdivision (a)(1), and prior prison term within the meaning of section 667.5, subdivision (b).

The court sentenced Guerrero to prison for 160 years to life. The court sentenced Figueroa to prison for 100 years to life.

Appellants appeal, contending the trial court prejudicially erred in: (1) allowing two prosecution witnesses to testify that a surveillance video depicts Appellants shooting the victims; (2) improperly instructing the jury as to the culpability required to be convicted of first degree murder as an aider and abettor; and (3) failing to instruct the jury on the definition of principal for the principal firearm use enhancements as to counts 1 and 2. In addition, Guerrero argues the evidence is insufficient to convict him of first degree murder and his trial counsel was constitutionally ineffective for not requesting the court instruct the jury under CALCRIM No. 522.

Because we conclude the trial court did not err, or if it did, such errors were harmless, we affirm.

FACTUAL BACKGROUND

The Shootings

On February 1, 2012, Roberto Elizarraraz (Roberto) and Adrian Garcia, members of the West Side Verdugo gang, drove with their friends, Colton Alvarado and Angel Perez, to an apartment building at 14th Street and Sepulveda in San Bernardino to pick up

---

[2]    Figueroa committed attempted murder when he was 13 years old, but the prosecution dismissed this allegation because it did not qualify as a strike prior.

3

Roberto's brother and fellow gang member, Eddie Elizarraraz (Eddie). Perez drove the group in his SUV. Although the neighborhood they were headed to was West Side Verdugo territory, Garcia was concerned that the heavy police presence there could pose problems because he was on parole and Perez was on probation. Nevertheless, Eddie told Roberto that he was experiencing problems, so the four friends went to get Eddie.

When they arrived at the two-story apartment complex, Roberto, Garcia, and Perez exited the SUV, while Alvarado remained in the vehicle at Garcia's suggestion "because the place [they] were going to is full of gang members . . . and [Alvarado]'s white." Garcia, Roberto, and Perez walked up a driveway, near the first entrance into the building, where they saw Eddie descend from a flight of stairs. They talked for "no more than two minutes," as Eddie told Roberto that he was upset about something. Apparently, Eddie told Roberto that someone from his gang wanted to kill him. Roberto was angered by this, which caused them to stay longer than expected.

Appellants, who are members of the Southside Verdugo Flats criminal street gang,[3] then emerged from one of the nearby apartments, where they had been socializing with others, including some members of West Side Verdugo. Guerrero was wearing a

---

3    At trial, the prosecution offered the testimony of Officer Raymond Bonshire as a gang expert. He identified Appellants as members of the Southside Verdugo Flats gang. Bonshire also testified about prior predicate offenses committed by members of that gang. Based on a hypothetical mirroring the facts of this case, Bonshire opined that the shootings were committed for the benefit of, at the direction of, and in association with the Southside Verdugo Flats criminal street gang. Appellants do not challenge this gang evidence; thus, we do not discuss it in more detail.

long sleeved white shirt and black jeans.  Figueroa was bald, had a tattoo of a "V" on his face, and was wearing dark checkered shorts (or pants), and a dark shirt.

Figueroa stood by the landing while Guerrero approached Roberto, Garcia, Eddie, and Perez and introduced himself as Weto[4] from the Verdugo Flats gang.  Garcia responded by identifying himself as "Clown from the Sur Crazy Ones" and shook hands with Guerrero.

However, once everyone shook hands and identified themselves and their gang affiliations, Guerrero and Roberto began to get into a verbal scrap over "what neighborhoods they were from."  Guerrero and Roberto then kept "going around in circles in each other's face" while "holding hands real tight and . . . saying Verdugo Flats gang, Lil' Counts gang, back and forth" in an unfriendly manner for "almost a minute." The back and forth verbal confrontation finally ceased when Perez "stepped up a little bit and said, [t]hat's enough."  When the two finally let go, Guerrero put his hands on a "pistol" in his right hand pocket.  At this time, Roberto also was armed with a gun and had several rounds of ammunition in his pocket, but he was never seen, or heard acknowledging, his gun during the confrontation with Guerrero.

As tensions escalated and Guerrero placed his hand on his gun, Garcia suggested to Perez, Roberto, and Eddie that the four of them leave.  But no one but Garcia was willing to walk away.

---

4    It is unclear whether Guerrero co-opted a moniker used by a fellow gang member or he embraced the nickname "Guero," a term commonly used to describe light skinned people of Hispanic descent.

Guerrero then nodded at Figueroa, signaling that he should come to his side. The two briefly talked out of earshot of Garcia.

Garcia retrieved the car keys from Perez and told his friends that he would pull up the car in front of the driveway so they could leave. Garcia walked out of the apartment complex toward the SUV. While Garcia stood outside the SUV, he talked to Alvarado "for a minute or two" and told him to get into the driver's seat and drive the SUV into the driveway.

As Garcia began to walk back toward his friend, he saw and heard Guerrero shoot Roberto, who fell to the ground. Figueroa then stood over Roberto's body and shot him at least twice more. Garcia saw Figueroa follow "right behind [Guerrero]."

Perez ran toward the apartment exit gate as Guerrero fired four shots into Perez's back. Figueroa was following Guerrero while he chased Perez. Alvarado heard shots fired and saw Perez run and fall. Perez fell after the first four shots, but then attempted to kick the gun out of Guerrero's hand. However, Perez was shot an additional 15 to 20 times. Eddie, who was not shot, escaped the area.

After shooting Roberto and Perez, Appellants left the apartment complex and fled south on Sepulveda. Adrian Nelson III, who lived in a nearby apartment, heard 10 to 13 gunshots then saw Appellants run past him as he left his residence. Figueroa turned around, pointed his gun at Nelson's head, told him to get on the ground, and then pulled the trigger. The gun made a clicking sound, but no bullet was fired. Figueroa then pointed the gun at Nelson's chest and pulled the trigger. Again, the gun made a clicking

6

sound, but no bullet was fired. Guerrero told Figueroa, "come on, fool, come on," and the two fled.

Once the shooting ended, Garcia hustled back into the apartment complex toward Roberto, but Roberto was dead. Perez, however, was moving and yelling for help. Garcia tried to lift Perez, but was unable to do so.

Both Roberto and Perez died from multiple gunshot wounds, within minutes, at the scene. Perez was shot at least 22 times. Roberto suffered two gunshot wounds to the chest and one between his eyes, right above his nose. Stippling indicated that the gun used to kill Roberto was no farther than two and a half feet away from Roberto when the trigger was pulled.

Police Investigation and Arrests

At 9:18 p.m. on February 1, 2012, San Bernardino police officers were dispatched to the subject apartment complex after a person complained that his vehicle was struck by gunshots. Officer Brent Baker, who was first to arrive, discovered two victims on the ground, both lying on their backs. Roberto appeared to be dead, but Baker found Perez laboring to breathe. However, he, too, eventually died at the scene. Detective Eddie Flores identified one of the victims as Roberto, a member of the West Side Verdugo gang, based on prior contacts with him. Perez was later identified because of his GPS ankle monitor, which he wore because he was on high risk parole.

Officers at the crime scene recovered 13 shell casings and six bullet fragments or bullets that constituted two types of ammunition: some were fired from the same .38 or .357 revolver and the remainder appeared to have been fired from a nine-millimeter

7

semiautomatic. Both types of bullets were recovered from each of the victims' bodies. None of the bullets or casings matched the gun Roberto was carrying at the time of the shooting.

At the scene, Garcia gave a statement to Turner. Garcia told Turner, among other things, that he saw a person, whom he later identified as Guerrero, chase Perez and shoot him in the back. He also saw Figueroa follow Guerrero, but he never saw Figueroa fire his gun.

In a subsequent police interview, Garcia picked both Appellants out of a six-pack photographic lineup. Fearing for his personal safety, Garcia only reluctantly cooperated with the police and requested anonymity. Months later, Garcia picked Guerrero out of a live lineup.

Officers also spoke to Nelson, who provided descriptions of the two men he saw run past him shortly after hearing shots fired. Nelson recalled one man, later identified as Guerrero, as a 20-year-old Hispanic, tattooless male with a goatee and spikey black hair, 5'8" to 5'9" in height, wearing dark pants and a black hooded sweatshirt, and carrying a semiautomatic firearm in his right hand. He described the other man, later identified as Figueroa, as a 19- to 21-year-old, "chunky," 5'7" to 5'8" Hispanic man with a shaved head, bloodshot eyes, a revolver in his right hand, and a tattoo under his right eye. Nelson, however, was unable to identify either Appellant in a subsequent photographic lineup.

8

About one week after the shooting, Flores retrieved video surveillance footage taken from four cameras outside the apartment complex.[5]  The footage depicted some of the incidents prior to the shooting and a portion of the shooting as well.  The video was grainy and pixelated, but Figueroa's facial tattoos could be seen as well as his clothing (plaid or checkered shorts, t-shirt, and white shoes).  The footage also revealed muzzle flashes emanating from guns held by two different people.

On February 8, 2012, Detective Michele Mahan of the San Bernardino Police Department spoke to Figueroa's cousin, Markita Eldridge, who lived with Figueroa.  Eldridge said that Figueroa told her that he "needed to cool down" on February 1, shortly after the murders were committed, before disappearing for a long period of time.  Although it was not unusual for Figueroa to go away for a few days, Eldridge was concerned how long he had been gone without hearing from him.  Eldridge also told Mahan that Figueroa had a handgun in his waistband on the date of the murders.  Finally, she told Mahan that Figueroa hangs around with "JR," which was one of Guerrero's monikers, who lives in "The Flats."

Hours later, Mahan obtained a warrant to search Figueroa's residence.  Mahan and three other officers searched the house and recovered:  a loaded Walther semiautomatic

---

[5]     The surveillance video consisted of three videos of different time frames that were put together as one exhibit (Exh. 12).  A video that depicted a portion of what was shown on Exhibit 12, but was "slowed down" was marked as Exhibit 13.  For convenience here, we use the phrase "surveillance video" to refer to both Exhibits 12 and 13.  Appellants do not challenge the admissibility of either exhibit.

handgun,[6] ammunition, a cell phone, a baseball cap, and a letter addressed to Eldridge. Figueroa, who was at the residence during the search, was placed under arrest.

Guerrero was arrested on April 27, 2012, about three months after the murders took place. He was arrested in Calexico, near a United States-Mexico border port of entry.

DISCUSSION

I

*LAY OPINION REGARDING THE
SHOOTERS' IDENTITIES ON THE SURVEILLANCE VIDEO*

Appellants contend the trial court prejudicially erred when it allowed two law enforcement witnesses (Bonshire and Flores) to opine that Appellants were the two shooters depicted in the surveillance video. As we explain below, we conclude the court did not abuse its discretion in allowing the testimony.

A. Background

During the prosecution's case-in-chief, the prosecutor asked Flores to identify the second shooter as depicted in the surveillance video. Flores testified, "[b]ased on [his] knowledge of the crime scene having been there the day of the shooting and [his] familiarity with the [apartment] complex," that the area being depicted in the video was

---

6     The parties stipulated that this gun did not match any of the bullets, bullet fragments, or shell casings retrieved from the victims' bodies or the crime scene.

the place where Roberto was shot and he identified Figueroa in the video.[7]  Flores explained that only two individuals in the video were wearing shorts:  Figueroa and Loar.  Flores then explained that Figueroa moved and stood over the second victim, Perez.  The prosecutor asked Flores to explain why he believed Figueroa was one of the shooters.  Flores responded, "Again, based off the clothing description of Jeremy Figueroa earlier before the shooting stills that we reviewed before, clothing matches the clothing of the individual that is going to the left of the screen near the second victim, Angel [Perez].  Based off the clothing as well as the shoes he's wearing, white shoes, and he then exits through the gate in a southbound direction on Sepulveda."  Flores testified that he ruled out Loar as a shooter because, in a portion of the video, he is seen running away from the scene.  Flores provided this testimony over numerous objections on the grounds of lack of foundation by Figueroa's counsel, including, eventually, a continuing objection to Flores's testimony.

Flores also explained that he had between six and 10 prior contacts with Loar, which allowed him to identify him in still pictures taken from the video as well as the video.  Before the night of the shooting, Flores had met and spoken with Figueroa once, and he had seen him one additional time prior to speaking with him, but did not talk to him on that previous occasion.  Flores testified that he was aware that Figueroa had a tattoo on his face from his previous encounters with him, but admitted he had seen

---

7      Flores testified that he could identify three people in the video:  Erick Loar, Roberto, and Figueroa.

11

pictures of more than 15, but fewer than 25 other individuals who also had tattoos on their face.

Additionally, during the prosecution's case-in-chief, the prosecutor called Bonshire as a witness. Bonshire testified as a gang expert. After discussing criminal street gang culture, the specific gang Southside Verdugo Flats and its territory, the predicate crimes of some members of the Southside Verdugo Flats, Bonshire identified both Guerrero and Figueroa in court.

Later, during Bonshire's testimony, the prosecutor prefaced some of his questions by explaining he was "briefly moving away from the gang portion of your testimony." The prosecutor then asked Bonshire if he had reviewed the surveillance video of the apartment complex, to which Bonshire said he had. Bonshire identified Appellants from still photographs taken from the video. In identifying Figueroa in the picture, Bonshire identified the tattoo on Figueroa's cheek. Bonshire also was able to identify Loar from a still picture taken from the video. Bonshire identified Appellants as the shooters in the video. Neither one of Appellants' trial counsels objected to Bonshire's testimony.

### B. Analysis

As a threshold matter, the People contend Appellants forfeited their objection that Flores's and Bonshire's testimony identifying Appellants as the shooters on the video was improper lay opinion by failing to object on those grounds. We note that Figueroa's trial counsel objected to Flores's testimony on the basis of lack of foundation. At a sidebar conference regarding the admissibility of Flores's testimony, the court and the parties

12

clearly discussed whether Flores should be permitted to provide an opinion that the video shows Figueroa as one of the shooters. The court ultimately ruled:

> "And that's this video, the resolution of the video is not entirely clear. But the witness can certainly make -- render an opinion as to whether or not an individual is the person that he has prior contacts with and is now the person that is the subject in a particular excerpt or particular portion of a video. The weight of which will be determined by the jury."

In allowing Flores's opinion testimony, the court also explained that it would give Flores's trial counsel "substantial latitude with respect to cross-examination." As such, the record makes clear that the court understood Figueroa's trial counsel was objecting to Flores's lay opinion testimony. Therefore, even though the objection was as to lack of foundation, the court clearly considered the very issue that is before us now: Whether Flores could provide lay opinion testimony identifying Figueroa as one of the shooters on the video. We find no forfeiture as to Appellants' challenge to Flores's testimony.

We also observe that no objection was made to Bonshire's testimony identifying Appellants as the shooters on the video. However, a defendant need not object if it would have been futile to do so. (*People v. Sandoval* (2001) 87 Cal.App.4th 1425, 1433, fn. 1.) Here, we are confident had either Appellant objected to Bonshire's opinion testimony on the same foundation grounds, the court would have overruled it. Such objection therefore would have been futile. Consequently, we will address the merits of Appellants' contentions here.[8]

---

8    Guerrero characterizes Bonshire's testimony as improper expert opinion testimony. We disagree. Although Bonshire was the gang expert, he was not testifying as an expert

Lay opinion testimony is admissible if it is both rationally based on the perception of the witness and helpful to a clear understanding of the witness's testimony. (Evid. Code, § 800.) For example, an individual who did not witness a crime may identify a defendant from photographs and surveillance videos if the individual has prior personal knowledge of the defendant and the testimony will assist the trier of fact in determining the identity issue. (*People v. Ingle* (1986) 178 Cal.App.3d 505, 513 (*Ingle*); *People v. Mixon* (1982) 129 Cal.App.3d 118, 128 (*Mixon*); *People v. Perry* (1976) 60 Cal.App.3d 608, 614-615 (*Perry*).) The question of the degree of personal knowledge goes to the weight, rather than to the admissibility of the opinion. (*Id.* at p. 613.) We review a trial court's admission of lay opinion testimony on identification for abuse of discretion. (*People v. Thompson* (2010) 49 Cal.4th 79, 128.) Because a trial court has wide discretion in deciding to admit or exclude evidence, an abuse of discretion is established only where the trial court acts in an arbitrary or irrational manner, exceeding all bounds of reason. (*People v. Kelly* (1992) 1 Cal.4th 495, 523; *People v. Preyer* (1985) 164 Cal.App.3d 568, 573-574.)

The robbery victims in both *Mixon* and *Perry* could not clearly see the robbers during the crime and thus could not identify them in surveillance videos or in person lineups. The trial courts in these cases properly admitted the lay opinion testimony of

in identifying Appellants on the surveillance video. Indeed, before asking Bonshire about the video, the prosecutor told Bonshire he was going to move away from the "gang portion" of his testimony. This was an indication that Bonshire was not testifying as an expert. Moreover, Guerrero has not shown where the prosecution offered Bonshire's opinion testimony as to the identity of Appellants as the shooters as an expert opinion. Finally, Guerrero did not object to Bonshire's testimony as an improper expert opinion; thus, he has forfeited this challenge here.

14

police officers identifying the defendants as the robbers in a surveillance video (*Perry*) and a photograph (*Mixon*) shown to the jury. The officers predicated their identifications upon personal knowledge of the defendants from contacts before the robberies had occurred, which aided the juries because each defendant had altered his appearance prior to trial. (*Mixon*, *supra*, 129 Cal.App.3d at p. 130; *Perry*, *supra*, 60 Cal.App.3d at p. 613.)

*Ingle* involved a robbery victim, who was able to see the robber during the crime. (*Ingle, supra*, 178 Cal.App.3d at pp. 508-509.) The trial court properly admitted the victim's opinion testimony identifying the defendant as the robber in a surveillance video shown to the jury. (*Id*. at p. 514.) Her identification testimony satisfied *Mixon, supra,* 129 Cal.App.3d 118 and *Perry, supra,* 60 Cal.App.3d 608 because it was based upon her observations and perceptions of him during the robbery. (*Ingle, supra,* at p. 514.) The video was of such poor quality that it alone was insufficient to establish the robber's identity conclusively. (*Ibid*.)

More recently in *People v. Larkins* (2011) 199 Cal.App.4th 1059, a witness, who was not a victim or police officer, was permitted to testify the defendant shown in a surveillance video was the same man the witness had previously seen in numerous other surveillance videos, although the witness had never before seen the defendant in person, and the videos had since been erased. (*Id.* at p. 1065.) The court distinguished *Mixon, supra,* 129 Cal.App.3d 118 and *Perry, supra,* 60 Cal.App.3d 608 as involving photographs rather than videos, noting, "It is one thing to see a single photo of a person and attempt to identify that person based on it. But, here, the manager saw 20 to 30 videos of defendant, during which time he could observe such distinguishing

15

characteristics as defendant's posture gait and body movements." (*Larkins, supra,* at p. 1067.) The court concluded, that "whatever the holdings of *Perry* and *Mixon*, they are logically inapplicable to videos," adding the jury could compare the witness's identification testimony with five photographs taken from the videos and admitted into evidence. (*Larkins, supra,* at pp. 1067-1068.)

Here, we conclude the trial court did not abuse its discretion in admitting the lay opinion testimony of Flores and Bonshire that Appellants were the men in the surveillance video who shot the victims. The requirements of Evidence Code section 800 were met. First, the officers' testimony was "[r]ationally based on" their perception. (Evid. Code, § 800, subd. (a).) Flores, who identified Figueroa, talked with him once prior to the shooting and saw "him up close prior to that" as well. Bonshire testified that, as a member of the San Bernardino Police Department's gang unit, he was familiar with Appellants prior to the night of the shooting. Flores and Bonshire each watched the surveillance video. With this foundation in mind, it is clear that Flores's and Bonshire's opinions that the video depicted Appellants was rationally based on their perceptions.

Second, the officers' opinions were "[h]elpful to a clear understanding of [their] testimony." (Evid. Code, § 800, subd. (b).) Through their familiarity with Appellants, the officers offered a unique ability to assist the jury to identify Appellants on the video. Because the surveillance video lacked the clarity or definition to allow jurors to easily identify the shooters, the officers' testimony was essential to explain how the video was nonetheless useful to show the shooters' identities.

16

We are not concerned by Appellants' contention that the faces of the shooters could not be seen when the shots were fired. Although we do not endorse the process of identifying a witness on a video by clothing alone, Appellants' argument glosses over the fact that Flores identified Figueroa based on a still photograph taken from the video and Bonshire identified both Appellants in the same manner. Thus, the evidence suggests that Appellants were more visible on some portions of the video, but less so during the shootings. In addition, it is undisputed that Appellants were at the apartment complex at the time of the shootings and an eyewitness (Garcia) saw both Guerrero shoot Roberto and Figueroa following after Guerrero. Under the specific facts of the case, we are not bothered by the manner in which the officers identified Appellants on the surveillance video.

Likewise, we are not persuaded by Appellants' attacks on the extent of Flores's and Bonshire's prior contacts with Appellants. " '[T]he question of the degree of knowledge goes to the weight rather than the admissibility of the opinion.' " (*Mixon*, *supra*, 129 Cal.App.3d at p. 131; *Perry*, *supra*, 60 Cal.App.3d at p. 613.) The jury thus could weigh whether it believed Flores and Bonshire were able to identify Appellants on the video, and the court properly instructed it to do so:

> "Witnesses, who were not testifying as experts, gave their opinions during the trial. You may but are not required to accept those opinions as true or correct. You may give the opinions whatever weight you think appropriate. Consider the extent of the witness's opportunity to perceive the matters on which his or her opinion is based, the reasons the witness gave for any opinion, and the facts or information on which the witness relied in forming that opinion. You must decide whether information on which the witness relied was true and accurate. You may disregard all or any part of an

17

opinion that you find unbelievable, unreasonable, or unsupported by the evidence."  (CALCRIM No. 333.)

Moreover, the court gave the defense great leeway in cross-examining Flores and Bonshire.  Accordingly, counsel had ample opportunity to convince the jury to disregard the testimony of Bonshire and Flores that Appellants were the shooters depicted on the video.

Also, we are not swayed by Appellants' argument that the officers' testimony identifying them as the shooters somehow usurped the jury's factfinding role.  A witness's identity opinion testimony "is admissible on the issue of identity, and such evidence does not usurp or improperly invade the province of the trier of fact."  (*Ingle*, *supra*, 178 Cal.App.3d at p. 513; see *Perry*, *supra*, 60 Cal.App.3d at pp. 613-615; *Mixon*, *supra*, 129 Cal.App.3d at pp. 131-134.)  Therefore, Flores's and Bonshire's opinion testimony that Appellants were the persons in the surveillance video was relevant, and properly introduced on the issue of identity.[9]

In short, under the unique facts of this case, the court did not abuse its discretion in allowing Flores and Bonshire to testify as to the identity of the shooters on the video.

---

[9]    In this sense, the real issue seems to be one involving Evidence Code section 352 and not the improper admission of a lay opinion.  Was the probative value of the officers' respective testimony substantially outweighed by its prejudicial impact?  (See Evid. Code, § 352.)  On the record before us, it clearly was not.

18

## II

## *AIDING AND ABETTING JURY INSTRUCTION*

Appellants contend the trial court erred by improperly instructing the jury on aiding and abetting liability. Specifically, Appellants maintain the instructions did not inform the jury that an aider and abettor's culpability is not necessarily coextensive with that of the direct perpetrator. Appellants further assert that the jury was not informed that a person who aided and abetted a crime also could be found culpable for a lesser crime than the perpetrator. Without such an instruction, Appellants argue the jury could have convicted them of whatever crime the direct perpetrator committed simply on the basis they were present and their presence facilitated the crime without regard to their individual mens rea.

However, the People note that neither Appellants' trial counsel objected to any of the instructions regarding aiding and abetting or requested an additional instruction regarding aiding and abetting. By failing to object to or request a specific jury instruction at trial, Appellants forfeited this claim on appeal, unless the claimed error affected Appellants' substantial rights. (See § 1259; *People v. Flood* (1998) 18 Cal.4th 470, 482, fn. 7.) "Ascertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim--at least to the extent of ascertaining whether the asserted error would result in prejudice if error it was." (*People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249.) We conclude that Appellants have not shown that the claimed error affected their rights; thus, they have forfeited their claim.

19

We review a claim of instructional error de novo. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) "Review of the adequacy of instructions is based on whether the trial court 'fully and fairly instructed on the applicable law.' " (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.) In determining whether error has been committed in giving jury instructions, we consider the instructions as a whole and assume jurors are intelligent persons, capable of understanding and correlating all jury instructions which are given. (*Ibid.*) " 'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' " (*Ibid.*) "The crucial assumption underlying our constitutional system of trial by jury is that jurors generally understand and faithfully follow instructions." (*People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17.)

Generally, a person who aids another in committing a crime is " 'equally guilty' " of that crime. (*People v. Lopez* (2011) 198 Cal.App.4th 1106, 1118; see § 31.) However, at times, an aider may be found guilty of a greater or lesser crime than the perpetrator. (See *People v. McCoy* (2001) 25 Cal.4th 1111, 1114-1122 (*McCoy*) [aider may be guilty of greater homicide offense than committed by perpetrator because of "defenses or extenuating circumstances . . . that are personal to the actual perpetrator and do not apply to the aider and abettor"].) Accordingly, "when a person, with the mental state necessary for an aider and abettor, helps or induces another to kill, that person's guilt is determined by the combined acts of all the participants as well as that person's own mens rea." (*Id.* at p. 1122.) Thus, if one defendant's mens rea is more culpable than his codefendant's, his "guilt may be greater even if the other might be deemed the actual perpetrator." (*Ibid.*)

20

At trial, the prosecution's theory of the murders was that both Appellants planned and carried out a coordinated attack on the victims with the intent to kill them. Nevertheless, because Appellants were undeniably present at the scene during the crime, but denied being the shooters, the issue existed of whether each appellant was a direct perpetrator or an aider and abettor. (See *McCoy*, *supra*, 25 Cal.4th at p. 1120 [dividing line between actual perpetrator and one who aids is often blurred].) The trial court therefore instructed the jury on theories of aiding and abetting and uncharged conspiracy.

Here, the court instructed the jury that, "A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator." (CALCRIM No. 400.) The court also instructed the jury under CALCRIM No. 401, which sets forth the elements of aider and abettor liability. That instruction, provides, in relevant part:

> "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that:
>
> "1. The perpetrator committed the crime;
>
> "2. The defendant knew that the perpetrator intended to commit the crime;
>
> "3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime;
>
> "AND
>
> "4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime.
>
> "Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime.

21

"If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor.

"If you conclude that defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider and abettor. However, the fact that a person is present at the scene of a crime or fails to prevent the crime does not, by itself, make him or her an aider and abettor."

CALCRIM No. 401 told the jury that neither Appellant could be guilty of aiding and abetting a crime (here, first degree murder) unless the direct perpetrator committed the crime, he knew of the direct perpetrator's intent, he shared the same intent as the direct perpetrator, and he did, in fact, aid and abet the perpetrator's commission of the crime. These instructions make clear that for aider and abettor liability to attach, all of these elements must have been met to find an accomplice guilty of the direct perpetrator's crime.

In other words, CALCRIM No. 401 made clear that if either or both Appellants were somehow involved in the two killings while having a less culpable mental state than the actual killer, aider and abettor liability could not attach. (See *People v. Beeman* (1984) 35 Cal.3d 547, 560 (*Beeman*).)

Thus, CALCRIM No. 401 comports with the rule that an accomplice must share the specific intent of the perpetrator when the offense charged is a specific intent crime, as is the case here. (*People v. Prettyman* (1996) 14 Cal.4th 248, 259.) The instructions clarify that such a specific intent is shared when the accomplice "knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or

22

purpose of facilitating the perpetrator's commission of the crime." (*Ibid*., quoting *Beeman*, *supra*, 35 Cal.3d at p. 560.)

To the extent Appellants contend the aiding and abetting instruction somehow reduced the prosecutor's burden of proof by eliminating the need to prove Appellants' respective intents, we disagree. Other instructions elaborated on the required intent. The jury was properly instructed on first degree murder (CALCRIM No. 521), second degree murder (CALCRIM Nos. 520, 521), and voluntary manslaughter (CALCRIM No. 570) as well as the requisite mental states for these offenses (CALCRIM No. 252). In describing the crime of first degree murder, CALCRIM No. 521 necessitated a finding that the killer(s) acted willfully, deliberately, and with premeditation if they intended to kill. These instructions also gave the jury the option of finding Appellants guilty of killing the victims without deliberation, an option which it declined. "Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions." (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.) Accordingly, we find no error in the instructions provided.

In addition, we see no prejudice here. Although an aiding and abetting instruction was provided to the jury, Appellants have not pointed to the record where the prosecutor ever argued that Appellants were guilty as aiders and abettors. Instead, the prosecutor took the position and offered evidence to prove Appellants shot and killed the victims. Appellants argued they were present at the time of the shootings, but played no role. The jury found the prosecution's evidence persuasive and convicted Appellants of first degree murder as well as finding true that each Appellant personally used a firearm to kill the

23

victims.  Alternatively stated, the jury did not find Appellants guilty under any aiding and abetting theory, but instead, found they both directly participated in the shooting.  There is nothing in the jury instructions regarding aiding and abetting that undermines that verdict.

III

*LACK OF A JURY INSTRUCTION DEFINING THE TERM "PRINCIPAL"*

In connection with counts 1 and 2, the jury found true that a principal personally used a firearm.  (§ 12022.53, subds. (b), (e)(1).)  Although the jury was instructed on personal firearm use and discharge, it was not instructed on the definition of "principal" under CALCRIM No. 1402.  Thus, the court failed to instruct the jury regarding one of the elements of the principal firearm use enhancement.  Appellants argue that such error requires reversal.  The People concede that the trial court erred as to the failure to provide this instruction, but argue the error was harmless.

When, as here, the court fails to instruct on an element of an enhancement, we must review the record to determine if the error was harmless beyond a reasonable doubt.  (*People v. Nordberg* (2010) 189 Cal.App.4th 1228, 1238-1239.)  The error is reversible " 'unless it can be shown "beyond a reasonable doubt" that the error did not contribute to the jury's verdict.' "  (*Ibid.*; see *People v. Flood, supra,* 18 Cal.4th 470, 504.)

"One situation in which an instructional error in omitting an element of an enhancement allegation from jury consideration may be found harmless is when 'the defendant concedes or admits that element.'  [Citation.]  Another situation warranting a harmless error conclusion is where 'all of the evidence at trial relevant to the issue in

24

question [is such that] there is no rational basis upon which the instructional error could have affected the jury's verdict.' " (*People v. Nordberg*, *supra*, 189 Cal.App.4th at p. 1239; italics omitted.) The second situation applies here.

The jury found that Appellants committed first degree murder. They also found true that Appellants personally used a firearm, personally and intentionally discharged a firearm, and personally and intentionally discharged a firearm causing the death of the victims. Put differently, the jury concluded that Guerrero and Figueroa each shot and killed both the victims. Appellants both directly committed the murders and used guns to do so. Except for their challenge to the aiding and abetting instruction (which we concluded was meritless above), Appellants do not challenge any of the instructions related to counts 1 and 2 or these particular enhancements related to those counts.

In addition, the jury found true, as to both Appellants, in regard to counts 1 and 2, a principal personally used a firearm. Appellants claim this finding cannot stand because the jury was not instructed under CALCRIM No. 1402, which provides in relevant part "[a] person is a principal if he or she directly commits . . . the crime if he or she aids and abets someone else who commits . . . the crime." We are not persuaded. The fact that the court did not provide the jury with an instruction defining "principal" could not have affected the jury's verdict. Even without CALCRIM No. 1402, the record leaves no doubt whatsoever that the jury believed both Appellants to be principals, i.e., they directly committed the murders.

The evidence was particularly strong that Appellants shot and killed the victims. Guerrero got into a verbal altercation regarding criminal street gang affiliation with one

25

of the victims. After the altercation, Guerrero was seen touching his gun. Then he called Figueroa to his side for a two-minute conversation, after which, Appellants began shooting. Eyewitness testimony, the surveillance video, and other circumstantial evidence clearly points to Appellants murdering the victims. This evidence coupled with the jury's other findings leads us to conclude there was no reasonable possibility the jury would have rendered a different verdict had the trial court properly instructed it on the elements of a principal's firearm use and discharge. The error was harmless beyond a reasonable doubt.

IV

*SUBSTANTIAL EVIDENCE OF FIRST DEGREE MURDER*

Guerrero contends the evidence was insufficient to support the jury's finding that he acted with premeditation and deliberation in convicting him of first degree murder. "Review on appeal of the sufficiency of the evidence supporting the finding of premeditated and deliberate murder involves consideration of the evidence presented and all logical inferences from that evidence in light of the legal definition of premeditation and deliberation. . . . Settled principles of appellate review require us to review the entire record in the light most favorable to the judgment below to determine whether it discloses substantial evidence--that is, evidence which is reasonable, credible, and of solid value--from which a reasonable trier of fact could find that the defendant premeditated and deliberated beyond a reasonable doubt. [Citations.] The standard of review is the same in cases such as this where the People rely primarily on circumstantial evidence." (*People v. Perez* (1992) 2 Cal.4th 1117, 1124.)

26

As the reviewing court, we need not conclude there was evidence beyond a reasonable doubt to support the verdict. Rather, the test is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319; italics omitted.) We affirm the conviction "unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

" ' "[P]remeditated" means "considered beforehand," and "deliberate" means "formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action." [Citation.]' [Citation.] 'The process of premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . ." ' " (*People v. Lee* (2011) 51 Cal.4th 620, 636 (*Lee*).)

In *People v. Anderson* (1968) 70 Cal.2d 15 (*Anderson*), our high court determined that evidence sufficient to sustain a finding of premeditation and deliberation generally falls into three basic categories: "(1) facts about how and what defendant did prior to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing--what may be characterized as 'planning' activity; (2) facts about the defendant's prior relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that

27

the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [citation]; [and] (3) facts about the nature of the killing from which the jury could infer that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his [or her] victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2)." (*Id*. at pp. 26-27; italics omitted.) The court further noted that "[a]nalysis of the cases will show that this court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)." (*Id*. at p. 27.)

Relying on *Anderson*, *supra*, 70 Cal.2d 15, Guerrero contends the evidence does not sufficiently satisfy any of the three factors highlighted by the court. However, we are hesitant to place too much significance on those three factors. Ever since that case was decided, the California Supreme Court repeatedly cautioned that *Anderson* sets forth "guidelines" that are merely "descriptive" (*People v. Perez, supra*, 2 Cal.4th at p. 1125; *People v. Mendoza* (2011) 52 Cal.4th 1056, 1069-1072 [court used the *Anderson* factors "as a guide"]), the three factors or categories of evidence identified in *Anderson* are not "exhaustive," and "*Anderson* does not require that these factors be present in some special combination" (*People v. Pride* (1992) 3 Cal.4th 195, 247). As our high court more recently explained, the three *Anderson* factors " 'are not exclusive, nor are they invariably determinative. [Citation.] " '*Anderson* was simply intended to guide an appellate court's assessment whether the evidence supports an inference that the killing occurred as the

28

result of preexisting reflection rather than unconsidered or rash impulse.' " ' " (*Lee*, *supra*, 51 Cal.4th at p. 636.)

Here, there is ample evidence in the record to support a finding that Guerrero killed the victims with premeditation and deliberation. The evidence showed a clear motive for Guerrero to kill Perez and Roberto. Guerrero and Roberto had a verbal altercation regarding their respective gangs. Guerrero, a member of the Southside Verdugo Flats gang, was present in West Side Verdugo gang territory. Roberto belonged to the West Side Verdugo gang and Perez was his friend. Bonshire, the prosecution's gang expert, testified that the killing of Perez and Roberto would benefit Guerrero's own reputation as well as the reputation of his gang. By killing the victims, Guerrero demonstrated fearlessness as he was outnumbered in another gang's territory. Thus, the record shows substantial evidence of Guerrero's motive.

There also was sufficient evidence of planning although it did not consist of extensive deliberation or long term preparations. Guerrero and Figueroa brought their loaded guns with them and used those guns to kill the victims. (See *People v. Miranda* (1987) 44 Cal.3d 57, 87 ["[T]he fact that defendant brought his loaded gun into the store and shortly thereafter used it to kill . . . reasonably suggests that defendant considered the possibility of murder in advance."].) Guerrero carried a loaded weapon in his pocket, walked up to a group of rival gang members, and confronted them even though he was outnumbered. Garcia testified that Guerrero and Roberto spent about a minute repeating their gang names to each other while going around in circles. Garcia also stated that after the verbal altercation, he "could see Mr. Guerrero grabbing his pistol and walking away

29

from the group." Guerrero summoned Figueroa and they conferred out of earshot of others for about two minutes before the shootings took place. Certainly, the jury could reasonably infer from Guerrero and Figueroa's meeting and the shooting that followed that Appellants had discussed killing members of the West Side Verdugo gang who were at the apartment complex. This is especially true here where Guerrero had sufficient time to cool down after his verbal altercation with Roberto. Indeed, Guerrero could have walked away and left the apartment complex. Instead, he stayed and shot the victims.

Finally, the manner of killing here also supports the jury's verdict that Guerrero committed first degree murder with premeditation and deliberation. While the record is not clear which Appellant fired which gun, the evidence supports the conclusion that Guerrero shot both victims. Appellants decimated Roberto and Perez with a barrage of bullets, many fired at close range. Perez was shot 22 times. Several of the shots were fired while Perez was lying down. Roberto was shot between his eyes at close range (perhaps from as close as two and a half feet away). "This evidence as to the manner of killing supports a finding of deliberation." (*People v. San Nicolas* (2004) 34 Cal.4th 614, 658-659.) Moreover, even if the number of wounds were only suggestive that Guerrero shot Perez and Roberto out of rage, an inference of premeditation is not precluded. (*People v. Thomas* (1992) 2 Cal.4th 489, 518.)

In short, considerable evidence was offered at trial that Guerrero murdered Roberto and Perez with premeditation and deliberation. Taken in the light most favorable to the judgment, we conclude substantial evidence supports a reasonable trier of fact's determination of premeditation and deliberation beyond a reasonable doubt.

30

# V

## *GUERRERO'S CLAIM OF INEFFECTIVE ASSISTANCE OF COUNSEL*

The prosecution charged Guerrero with the first degree murders of Roberto and Perez. In addition to providing jury instructions on first degree murder, the court instructed the jury on second degree murder and voluntary manslaughter based on heat of passion and provocation. Although Guerrero's primary defense at trial was that he was not one of the shooters, the evidence showed that the shooting took place after Roberto and Guerrero got into a verbal altercation. Indeed, in deciding that the jury should be instructed under CALCRIM No. 570 (Voluntary Manslaughter: Heat of Passion), the court noted:

> "It is a difficult call. I mean, there are -- I think, [prosecutor], you have -- you know, certainly a valid point with respect to the Court not giving the instruction for voluntary manslaughter. But having there been some sort of an altercation that seemed to be symbolic of gang culture, with the circling, shaking hands and circling, the situation elevating, the emotional level of the situation being enhanced between, at least, Mr. Guerrero and one of the victims in the case, there could be a heat of passion inference. In an abundance of caution, the Court will give that instruction, which is, I believe, 570."

Because the trial court provided the jury with CALCRIM No. 570, Guerrero argues that his trial counsel was constitutionally ineffective for failing to request CALCRIM No. 522, which provides, "Provocation may reduce a murder from first degree to second degree and may reduce a murder to manslaughter. The weight and significance of the provocation, if any, are for you to decide. [¶] If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding

whether the crime was first or second degree murder. Also, consider the provocation in deciding whether the defendant committed murder or manslaughter." On the record before us, we cannot conclude Guerrero's trial counsel was constitutionally ineffective for failing to request this instruction.

To show that trial counsel's performance was constitutionally defective, an appellant must prove: (1) counsel's performance fell below the standard of reasonableness, and (2) the "deficient performance prejudiced the defense." (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688 (*Strickland*).) Competency is presumed unless the record affirmatively excludes a rational basis for trial counsel's choice. (*People v. Ray* (1996) 13 Cal.4th 313, 349 (*Ray*); *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1260.) We reverse on the ground of inadequate assistance on appeal only if the record affirmatively discloses no rational tactical purpose for counsel's act or omission. (*People v. Lucas* (1995) 12 Cal.4th 415, 436-437 (*Lucas*); see *Ray*, *supra*, at p. 349.)

Guerrero's claim of ineffective counsel arises from his trial counsel's failure to request a certain jury instruction. However, we generally defer to the tactical decisions of trial counsel. (See *People v. Scott* (1997) 15 Cal.4th 1188, 1212; *People v. Holt* (1997) 15 Cal.4th 619, 703.) "[T]here is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' " (*Lucas*, *supra*, 12 Cal.4th at p. 437, quoting *Strickland*, *supra*, 466 U.S. at p. 689.)

The record before us is silent as to why Guerrero's trial counsel chose not to request the instruction. As Guerrero indicates in his opening brief, his main theory of

32

defense at trial was that Guerrero did not participate in the shooting. Perhaps his counsel did not request CALCRIM No. 522 because he believed such an instruction would make it more likely that the jury would conclude Guerrero was one of the shooters. (Cf. *People v. Hernandez* (2004) 33 Cal.4th 1040, 1053.) On the record before us, we simply cannot reach the conclusion that no rational tactical purpose existed for Guerrero's trial counsel's failure to ask for a limiting instruction. (*Lucas*, *supra*, 12 Cal.4th at pp. 436-437; *Ray*, *supra*, 13 Cal.4th at p. 349.)

Additionally, even if we were to find that Guerrero's trial counsel's representation of Guerrero was deficient, Guerrero's claim of ineffective counsel would still fail because he cannot show prejudice. Guerrero has not shown that it is reasonably probable that he would have realized a more favorable result in counts 1 or 2 if CALCRIM No. 522 had been given to the jury. The evidence against Guerrero was extremely strong. He was identified by an eyewitness as the shooter. That same witness saw Guerrero touch his gun after the argument with Roberto. An officer identified Guerrero as a shooter on the surveillance video. The court gave the jury CALCRIM No. 570 (Voluntary Manslaughter: Heat of Passion), but the jury still found Guerrero guilty of first degree premeditated murder. Guerrero offers no compelling reason to believe the result would have been any different had his trial counsel requested and the court provided CALCRIM No. 522.

DISPOSITION

The judgment is affirmed.

HUFFMAN, J.

WE CONCUR:

McCONNELL, P. J.

AARON, J.